# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:22-cr-20261-SHL |
| | ) |
| JUAN ANTONIO COVARRUBIAS GARCIA, | ) |
| | ) |
| Defendant. | ) |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant Juan Antonio Covarrubias Garcia's ("Covarrubias" or "Defendant") Motion to Suppress, filed January 31, 2023. (ECF No. 35.) The Government filed its Response on February 14, 2023. (ECF No. 38.) The Court conducted an evidentiary hearing on the Motion, with the Government presenting its proof on April 11, 2023, (ECF No. 49), and Defendant presenting his proof on April 18, 2023, (ECF No. 51).

Defendant seeks to suppress all evidence seized during a search of his backpack on November 14, 2022. For the reasons discussed below, Defendant's Motion is **DENIED**.

## BACKGROUND

I.   **Factual Background[1]**

On November 14, 2022, West Tennessee Drug Task Force Agents Frank Bell and Sean Carlson were working at the Greyhound Bus Station at 3033 Airways Boulevard in Memphis, Tennessee. (ECF No. 38 at PageID 50.) As part of their duties on the Drug Task Force, the

---

[1] The following facts are taken from Defendant's Motion, the Government's Response, and the proof the Government presented at the suppression hearing. Facts related to Defendant's testimony at the suppression hearing are discussed in the next section.

Agents routinely interact with Greyhound passengers as they arrive at the station. (Id.) At approximately 8:45 a.m., the Agents met an inbound bus from Oklahoma City. (Id. at PageID 50-51.) They wore black jackets that identified themselves as police. (Id.) Bell boarded the bus before the passengers exited, identified himself as police, and told passengers, in English, that he and his fellow officer would be conducting consensual interviews related to drugs and guns. (Id. at PageID 51.)

According to Bell and Carlson, Bell exited the bus after his speech and stood on the platform several feet behind Carlson, who was also on the platform. (Id.; Ex. 1.) The Agents did not stand next to the bus or block the bus door. (Id.) They stood along the path from the bus to the terminal, with Carlson standing closer to the bus and Bell standing several feet behind him. (Ex. 1.)

The first person off the bus approached Carlson and stated that he had a knife. (ECF No. 38 at PageID 51.) Carlson sent this man to speak with Bell so that he could continue to interact with passengers as they walked toward him. (Id.) The man with the knife walked towards Bell and told him that he had a pocketknife. (Id.) After this man consented to a search of his bag, Bell saw the pocketknife and told the man that he was free to leave. (Id.)

Bell then saw Covarrubias exit the bus. (Id.) Covarrubias did not walk towards the terminal, but rather at first stood still and stared at the Agents, and then started walking towards the Agents. (Id.) As Covarrubias walked towards Bell, Bell asked how he was doing that day, to which Covarrubias responded, in English, "Good." (Id.) Bell then asked Covarrubias where he was going, to which he responded, in English, "North Carolina." (Id.)

2

Covarrubias disputes the Agents' account of his initial encounter with Bell. In his Motion,[2] Covarrubias states that he did not initiate the encounter with the Agents. He states that, as he got to the bottom of the stairs to exit the bus, one of the Agents said something to him in English that he did not understand. (ECF No. 35 at PageID 40.) According to the Motion, this Agent then shouted something to the other Agent who was near the bus terminal, and, when Covarrubias attempted to walk toward the terminal, the Agent blocked his path. (Id.)

According to the Government, after asking how he was and where he was going, Bell asked Covarrubias if he could search his backpack. (ECF No. 38 at PageID 51.) Covarrubias responded "yes" in English, took the backpack off, unzipped it, and handed it to Bell. (Id.) Covarrubias disputes this. He contends that Bell realized that he could not comprehend what he was saying so he began using hand gestures. (ECF No. 35 at PageID 40.) Bell pointed to his backpack, which Covarrubias understood to be a question about ownership. (Id.) Again according to the Motion, Covarrubias then said, in English, "yes." According to Covarrubias, this answer was intended to indicate that the backpack belonged to him. (Id.)

After Bell obtained the backpack, he searched it and found two "bricks" wrapped in brown mailing tape. (ECF No. 38 at PageID 51.) Based on his experience with narcotics, Bell believed that these packages contained illegal narcotics. (Id. at PageID 51-52.) According to Bell, he then asked Covarrubias what was in the packages to which he responded, in English, "I don't know. It's not mine." (Id. at PageID 52.) The Agents then handcuffed Covarrubias and moved him into a room inside the terminal. (Id.)

---

[2] Covarrubias gave a different account of his initial interaction with Bell while testifying at the suppression hearing. (See infra.)

3

Unlike the initial encounter outside the bus, the Agents' interview with Covarrubias inside the terminal was recorded by Bell's bodycam. (See ECF No. 35 at PageID 39; Ex. 3.) Once inside the terminal, Bell asked Covarrubias his name, to which Covarrubias responded, "Juan Antonio." (ECF No. 38 at PageID 52.) Bell then asked, "Do you know what is inside these packages?" (Id.) Covarrubias shook his head negatively, speaking first in English and then switching to Spanish saying, "No, I don't know. No sé, No sé que traerlo." (Id.)

After receiving these responses, Bell read Covarrubias his Miranda rights in English and asked if he understood. (Id.) Covarrubias shook his head negatively and said, in Spanish, "No, no entiendo." (Id.) The Agents then asked Covarrubias if he could speak English. Covarrubias shook his head and responded, in Spanish, "un poco." (Ex. 3.) Bell then asked Covarrubias, in English, if he had a copy of his bus ticket, to which Covarrubias responded, in Spanish, "en el telefono." (Id.) Carlson then left the room to retrieve a written Spanish translation of the Miranda rights. (ECF No. 38 at PageID 53.)

After Carlson left the room, Bell asked Covarrubias, in English, how old he is, to which Covarrubias responded, in Spanish, "treinta y tres." (Ex. 3.) Bell then asked Covarrubias again if the brown packages were his, to which he responded, in English, "No, they are not mine." (Id.) While waiting for Carlson to return, Covarrubias' phone began to ring and he stated, in English, "It's my wife." (Id.) Carlson then came back into the room and handed Covarrubias a written Spanish translation of the Miranda rights. (Id.) After reading the sheet, Covarrubias stated, in Spanish, that he understood his rights and did not want to talk to the Agents. (Id.)

Next, the Agents transported Covarrubias to a holding room at the Drug Task Force office. (Id.) Inside the holding room, Carlson asked Covarrubias, in a mix of English and

4

Spanish, to initial a Miranda form if he understood his rights. (Id.) Covarrubias responded by repeatedly stating, in English, "I know my rights." (Id.)

The brown packages were later taken to the Drug Task Force Office for testing. (ECF No. 38 at PageID 54.) Both packages tested positive for fentanyl. (Id.) Covarrubias was later charged with one count of possession with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. § 841. (ECF No. 1.)

## II.   Covarrubias' Testimony at the Suppression Hearing

Covarrubias testified at the suppression hearing. (See ECF No. 51.) While testifying, Covarrubias offered a different account of the circumstances leading to his arrest than the one he presented in his Motion. He stated that Carlson stood in front of him as he exited the bus, with one foot on the bus exit steps, and Carlson had to step down to allow him to exit the bus. According to his testimony, when Covarrubias exited the bus, Bell grabbed his sweater and asked where he was going. Covarrubias testified that he understood what Bell was saying despite his limited English proficiency and responded, in English, "North Carolina." Covarrubias stated that he then shifted his backpack strap to his other shoulder, at which point Bell grabbed the backpack off his back and said, in English, "I got you." Bell then opened the backpack, started searching it, and handcuffed Covarrubias. Covarrubias testified that he never provided consent and the Agents never asked if they could search his backpack.

During cross-examination, the Government asked Covarrubias about his English proficiency. He stated that he grew up five minutes from the U.S. border in Tijuana, Mexico, and that he took English classes through high school. He also testified that, as part of his work as a truck driver, he crossed the U.S. border approximately 400 times since 2014 and would occasionally interact with English speakers. Nonetheless, Covarrubias testified that he only had

5

a limited understanding of English. He stated that "how are you?" and "where are you going?" are two of the only English phrases that he understands, and that he is unfamiliar with the English words "weapon," "gun," and "drugs."

## ANALYSIS

Covarrubias moves to suppress all evidence arising out of the search of his backpack at the Greyhound station. He argues that he did not consent to the search of his backpack, and thus the warrantless search was invalid. The Government responds that Covarrubias gave Bell free and voluntary consent to the search. Based on the evidence presented at the suppression hearing, including the witnesses' testimony, Bell's bodycam footage, and the Court's credibility determinations, the Court concludes that Covarrubias validly consented to the search of his backpack.

### I. Legal Standard

The Fourth Amendment guarantees individuals the right to be free from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. Const. amend. IV. Police searches that are conducted with the searched party's voluntary consent are nonetheless constitutional, and any evidence discovered during those searches is generally admissible. Schneckloth v. Bustamonte, 412 U.S. 218, 245-46 (1983). Such consent must be voluntarily and freely given. United States v. Moon, 513 F.3d 527, 537 (6th Cir. 2008).

"Consent is voluntary when it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." United States v. McCaleb, 552 F.2d 717, 721 (6th Cir. 1977). "The government is required to show something more than 'mere acquiescence' on the part of the defendant." United States v. Holland, 522 F. App'x 265, 274 (6th Cir. 2013). The Court reviews the totality of the circumstances in determining whether consent was voluntarily

and intelligently given. See United States v. Elkins, 300 F.3d 638, 647 (6th Cir. 2002). Relevant circumstances include the age, intelligence, and education of the individual who purported to give consent; whether that individual understood the right to refuse consent; whether that individual understood his or her constitutional rights; and the use of coercive or abusive conduct by the police. United States v. Jones, 846 F.2d 358, 360 (6th Cir. 1988)

Relevant here, "[a] language barrier is a factor to consider when determining the validity of consent." United States v. Reyes-Martinez, No. 1:17-CR-00035-GNS-2, 2020 WL 7379141, at *4 (W.D. Ky. Sept. 25, 2020). "In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police." United States v. Valdez, 147 F. App'x 591, 596 (6th Cir. 2005) (quoting United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999)).

## II. Witness Credibility

As discussed above, at the hearing, Covarrubias testified to an account of the events on November 14, 2022, that is different than what he presented in his Motion,[3] and both of his versions of the events conflict with the Government's contentions. According to the Government, as Covarrubias exited the bus, the Agents stood on the platform, several feet away from the bus exit stairs. The Agents testified that Covarrubias initiated the encounter by walking towards them. As Covarrubias walked towards Bell, Bell engaged him in a conversation. During the conversation, Bell asked Covarrubias if he could search his backpack. (ECF No. 38

---

[3] Because Covarrubias' testimony at the hearing was under oath, the Court considers that version of the events to be his position. However, as described infra, the fact that his Motion argued a different version is of great concern and is considered as part of the credibility determination to be made here.

at PageID 51.) Covarrubias responded "Yes" in English, took the backpack off, unzipped it, and handed it to Bell. (Id.)

Covarrubias' testimony at the hearing paints a much different picture. He testified that, as he exited the bus, Carlson stood with one foot on the bus exit stairs and stepped down to allow him to exit the bus. According to Covarrubias' testimony, Bell blocked his path to the terminal, immediately grabbed his sweatshirt, grabbed his backpack off his back, said "I got you," and handcuffed him. Covarrubias stated that he never consented to the search and Bell never asked if he could search the backpack.

Because Covarrubias' testimony is directly at odds with the Agents' testimony, the Court must resolve the conflict. See United States v. Van Shutters, 163 F.3d 331, 340 (6th Cir. 1998). The Court has wide latitude in making witness credibility determinations. United States v. Haynes, 301 F.3d 669, 678 (6th Cir. 2002) (citing Anderson v. Bessemer City, N.C., 470 U.S. 564, 573-75 (1985)). To weigh the credibility of different witnesses, the Court may consider whether one account is more plausible on a certain issue and whether there are inconsistencies in the witnesses' testimony. Van Shutters, 163 F.3d at 336.

Whether Covarrubias consented to the search of his backpack is a finding of fact which turns on the credibility of the testimony given at the suppression hearing. Covarrubias' credibility is undermined by the fact that his testimony at the suppression hearing directly conflicted with the account he provided in his Motion. In his Motion, Covarrubias argues that he did not have sufficient understanding of English to provide valid consent. (ECF No. 35 at PageID 44.) He states that he understood Bell pointing to the backpack to be a question about ownership, and he understood his answer of "Yes" as communicating that the backpack belonged to him. (Id.) However, at no point during his testimony did Covarrubias state that he gave a

8

"Yes" answer to Bell or that he thought that Bell was asking him about the ownership of the backpack, instead contending that Bell grabbed him and the backpack. Whether Bell grabbed Covarrubias' sweatshirt, how Bell took possession of the backpack, and what Covarrubias and Bell said to each other are critical questions that go to the heart of whether Covarrubias provided consent. By substantially changing important aspects of his story at the suppression hearing, Covarrubias undermined his credibility as a witness. See Rogel-Rodriguez v. Barr, 822 F. App'x 374, 376 (6th Cir. 2020) (conflicting statements provided substantial evidence to find witness not credible); Velichko v. Holder, 565 F. App'x 454, 456 (6th Cir. 2014) ("[e]ver-shifting" story provided substantial evidentiary support for adverse credibility finding).

In addition to changing his story on the witness stand, Covarrubias further undermined his credibility by providing implausible testimony about his English language proficiency. Covarrubias testified that he had very limited English proficiency. He stated that "How are you?" and "Where are you going?" are two of the only English phrases that he understands, and that he is unfamiliar with the words "weapon," "gun," and "drugs." However, Bell's bodycam footage shows that Covarrubias had at least a limited, conversational understanding of English. For example, when Bell asked Covarrubias what was in the packages, he responded, in English, "I don't know. It's not mine." Covarrubias was also able to respond to Bell's questions about his name, how old he is, and whether he had a copy of his bus ticket. While detained Covarrubias repeatedly stated, in English, "I know my rights" after being asked if he understood his rights. When his phone rang during his detention, he stated, in English, "It's my wife."

To be sure, the fact that Covarrubias responded to some of these questions in Spanish shows that he is not fluent in English and that there was some degree of a language barrier between him and the Agents. Nonetheless, the video evidence shows that Covarrubias' English

9

proficiency was much better than what he testified to during the suppression hearing. This inconsistency between the video evidence and Covarrubias' hearing testimony further undermines his credibility as a witness.

On the other hand, the Agents' testimony did not suffer from any similar credibility issues. Bell's and Carlson's accounts of the events corroborate a conclusion that Covarrubias consented to a search of his backpack. Their testimony matched the Government's account of events in its Response. Furthermore, Bell and Carlson testified consistently with each other. For example, they gave the same answers about where each one stood in relation to each other and to Covarrubias. As such, the Court finds Bell and Carlson to be credible.[4] Given the multiple inconsistencies in Covarrubias' testimony, the Court finds him to be not credible. Therefore, the Court accepts the Agents' testimony as fact.

### III. Validity of Consent

Accepting the Agents' testimony as fact, the Court finds that, under the totality of the circumstances, Covarrubias' consent was free and voluntary. Covarrubias is thirty-three years old, and, with the aid of a Spanish interpreter, articulately testified at the hearing, such that he was of sufficient age and intelligence to provide valid consent. The Agents testified that there was no police-induced coercion or duress, and the conversation between Covarrubias and Bell was calm and cordial.

---

[4] Covarrubias argues that the lack of body camera footage of the events on the bus platform and the fact that the passenger with the knife was not asked the same questions as him undermine the Agents' credibility. However, the lack of any evidence of a policy requiring that the body cameras be turned on and the dissimilar nature of the two encounters renders Defendant's arguments unpersuasive.

As to the language barrier, Covarrubias was able to intelligently interact with Bell during their initial encounter. Bell testified that Covarrubias initially gave no signs of not understanding English as he quickly responded to the questions of how he was doing and where he was going. After Bell asked to search his backpack, Covarrubias said "yes" in English, took the backpack off, unzipped it, and handed it to him. This mix of verbal and non-verbal action conveyed a message that Covarrubias understood Bell's request and consented to the search of his backpack.[5] See United States v. Chambers, 646 F. App'x 445, 448 (6th Cir. 2016) (finding valid consent to search where defendant said "go ahead" and placed hands on a police cruiser); United States v. Ortiz, 455 F. App'x 669, 671-72 (6th Cir. 2012) (holding that native Spanish speaker gave valid consent to search premises by stepping back, gesturing, and opening door wider after officers asked to enter). Covarrubias also responded in English after Bell asked him what was inside the packages.

While Covarrubias later demonstrated limited English proficiency upon moving to the terminal, his initial conduct with Bell indicated a sufficient understanding of English such that he could intelligently interact with police regarding the request to search his backpack. Therefore, under the totality of the circumstances, the Court finds that Covarrubias voluntarily and intelligently consented to the search of his backpack.

---

[5] Even if the Court were to consider Covarrubias' argument in his Motion—that there was no valid consent because he misunderstood Bell's question—the Motion would still be denied. In considering the effect of a language barrier on a defendant's ability to consent, the Court employs an objective, not subjective, test of the defendant's ability to effectively communicate with police at the time of the search. See United States v. Valdez, 147 F. App'x 591, 596 (6th Cir. 2005). Here, the facts show that, objectively, it appeared that Covarrubias had the ability to intelligently and effectively respond to Bell's request to search, even if there was some degree of a language barrier.

11

## **CONCLUSION**

Because Defendant voluntarily consented to the search of the backpack, his Motion to Suppress is **DENIED**.

**IT IS SO ORDERED,** this 25th day of April, 2023.

s/ Sheryl H. Lipman<br>
SHERYL H. LIPMAN<br>
CHIEF UNITED STATES DISTRICT JUDGE